UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

WORTHINGTON INDUSTRIES,
INC., *et al.*,

          **Plaintiffs,**

    **v.**

INLAND KENWORTH (US),
INC.,

          **Defendant.**

          **Case No. 2:19-cv-3348**
          **JUDGE EDMUND A. SARGUS, JR.**
          **Magistrate Judge Kimberly A. Jolson**

## OPINION & ORDER

Currently pending before the Court is Defendant Inland Kenworth (US), Inc.'s ("Inland" or "Defendant") Motion to Dismiss for Improper Venue, or in the Alternative, to Transfer Venue (ECF No. 8). Plaintiffs Worthington Industries, Inc. and Worthington Cylinder, Corp. (collectively "Worthington" or "Plaintiff") have responded (ECF No. 14). Inland has replied (ECF No. 15). Thus, the motion is ripe for review. For the reasons stated herein, Defendant's Motion to Dismiss for Improper Venue, or in the Alternative, to Transfer Venue (ECF No. 8) is **GRANTED in part and DENIED in part.**

Additionally, Inland filed a Request for Judicial Notice in Support of its Motion (ECF No. 9). For the reasons stated herein this motion (ECF No. 9) is **GRANTED.**

### I.

Plaintiff Worthington Industries, Inc., is an Ohio corporation with its principal place of business in Columbus, Ohio. (Compl. ¶ 1, ECF No. 1.) This corporation is a "global, diversified, metals manufacturing company, and at the time of the events described herein, the leading global

manufacturer of pressure cylinders and related products for industrial, alternative fuel, energy, and consumer products markets." (*Id.*)

Plaintiff Worthington Cylinders, Corp., is an Ohio corporation with its principal place of business in Franklin County, Ohio. (*Id.* ¶ 2.) This corporation is a wholly owned indirect subsidiary of Worthington Industries, Inc. (*Id.*)

Inland is a New Mexico corporation with its principal place of business in Burnaby, British Columbia. (*Id.* ¶ 3.) In the United States, Inland has offices in New Mexico, Arizona, and California. (*Id.*; Peterman Decl. ¶ 2, 19, ECF No. 8-2.) Inland does not have offices, employees, or business operations in Ohio. (Peterman Decl. ¶ 19.) Inland distributes trucks manufactured by Kenworth Trucking Company ("Kenworth"). (Compl. ¶ 3.)

Worthington manufactured a "a unique line of onboard fuel systems allowing for the safe storage and transport of compressed natural gas [] for medium and heavy-duty trucks" ("CNG fuel systems"). (*Id.* ¶ 12.) Beginning in 2016, AJR Trucking, Inc. ("AJR"), a mail delivery trucking fleet company based in Compton, California, sought Kenworth trucks containing Worthington's CNG fuel systems. (*Id.* ¶ 13; Chris Khudikyan Decl. ¶¶ 3–4, ECF No. 8-3.) AJR is Inland's customer. (*Id.* ¶ 4.)

In mid-to-late 2016, Kenworth representative Jeff Stevens introduced Inland to Worthington.[1] (*Id.* ¶ 14; Takavitz Decl. ¶ 16, ECF No. 14-1.) In November of 2016, Inland representative Steve Abrahams discussed AJR's needs with Worthington representative Kyle Takavitz. (*Id.* ¶ 15; Takavitz Decl. ¶ 21.) Mr. Abrahams is an Inland sales representative, and Mr. Takavitch is Worthington's commercial director of fuel systems. (*Id.*) On November 15, 2016,

---

[1] Inland Representative Mr. Abrahams stated that Inland and Worthington had prior contact in connection with Inland's customer, Food Express. (Abrahams Decl. ¶ 6.) Mr. Steven's introduction in mid-to-late 2016, however, was the beginning of the relationship for transaction underlying the current lawsuit.

Worthington provided Inland with an initial budgetary quote for CNG fuel systems. (*Id.*; Takavitz Decl. ¶ 28.) On January 4, 2017,[2] Worthington submitted a quote to Inland for one CNG fuel system to be installed in a demonstration truck. (*Id.* ¶ 18; Takavitz Decl. ¶ 29.) On February 8, 2017, Inland sent a purchase order for one CNG fuel system. (*Id.*)

After Inland purchased a single CNG fuel system, representatives from Worthington, Inland, AJR, and sometimes Kenworth (the "representatives"), met on several occasions to further discuss Worthington's CNG fuel systems. Generally, these meetings included Mr. Takavitz, Jim Rike, Worthington's director of business development, Alex Libin, Worthington's national account manager, Chris Khudikyan, AJR's president, Jack Khudikyan, AJR's vice president, and Charles Peterman, Inland's director of fleet sales. (Peterman Decl. ¶¶ 8–9.)

First, the representatives met on December 20, 2016, at AJR's office in Compton, California. (*Id.*; Chris Khudikyan Decl. ¶ 7.) Next, on February 23, 2017, the representatives attended a crash test demonstration held by Worthington in Adelanto, California. (*Id.* ¶ 11; Chris Khudikyan Decl. ¶ 9.) Then, on March 15, 2017, the representatives met at Worthington's manufacturing facility in Pomona, California. (*Id.* ¶ 12; Chris Khudikyan Decl. ¶ 10.) Finally, on April 30, 2017, the parties met at an expo in Long Beach, California. (*Id.* ¶ 13; Chris Khudikyan Decl. ¶ 11.) During each of these meetings, Worthington "pitched" its CNG fuel systems to Inland and AJR. (*Id.* ¶¶ 7, 9–11; Chris Khudikyan Decl. ¶ 7.)

Throughout 2018, AJR purchased CNG fuel systems from Worthington, but complained of problems with the systems. (*Id.* ¶ 14–15; Chris Khudikyan Decl. ¶ 13.) The representatives continued to meet so that Worthington could alleviate Inland's concerns and advocate for more sales. (*Id.* ¶ 15.) The representatives met on January 1, 2018, for dinner in Hollywood, California;

---

[2] Aside from the dates for quotes and purchase orders, which are corroborated by the exhibits, the remaining dates in the Complaint are stated as "on or about," and thus, may be approximate.

3

on May 2, 2018, for an expo in Long Beach, California; and sometime in July of 2018, at AJR's offices in Compton, California. (*Id.*; Chris Khudikyan Decl. ¶ 18–19.)

On April 17, 2018, the representatives had dinner in Columbus, Ohio. (*Id.* ¶ 21; Takavitz Decl. ¶ 39; Chris Khudikyan Decl. ¶ 21 n.1.)  Mr. Takavitz states this dinner "focused on the Inland/Worthington relationship and AJR's interest in acquiring NG fuel systems.  In addition to exchanging pleasantries and personal conversation, [the representatives] discussed Worthington's [C]NG fuel systems and Worthington's relationship with Inland.  Th[e] dinner was certainly not a personal dinner; [it] was a dinner function." (Takavitz Decl. ¶ 39.)  Mr. Takavitz notes a photo was taken at the dinner and posted on social media, captioned "Work, Work, Work." (*Id.* ¶ 40.)

In contrast, Mr. Peterman states "[n]o one was doing any 'work' in that photograph (or at the dinner.  Rather, [the representatives] were having a celebratory meal at one of the best restaurants in Columbus the night before AJR was going to see the first of their 20 new" trucks. (Peterman Suppl. Decl. ¶ 4, ECF No. 15-1.)  Mr. Peterman also states "[n]o business was conducted during the meal, nor was any business conducted immediately before or after that meal." (*Id.* ¶ 5.)  Steve Abrahams, Jack Khudikyan, Brett Vanhoorhis, a Kenworth representative, and Chris Khudikyan all provide accounts of the dinner similar to Mr. Peterman's account.  (*See* Abrahams Decl. ¶¶ 4–5, ECF No. 15-3; Jack Khudikyan Decl. ¶¶ 3–4, ECF No. 15-4; Vanhoorhis Decl. ¶ 5, ECF No. 15-5; Chris Khudikyan Suppl. Decl. ¶¶ 2–3, ECF No. 15-6.)

On April 18, 2018, Inland toured Kenworth's Chillicothe plant as well as Worthington's headquarters in Columbus, Ohio.  (Takavitz Decl. ¶¶ 41–42.)  The visit to Worthington's headquarters included "a visit with Worthington's leadership team," "additional conversations about [C]NG fuel systems and Inland's business relationship with Worthington [sic]," and "a presentation providing an overview of Worthington's [C]NG fuel systems." (*Id.*)  Mr. Peterman

states no negotiations were conducted, no payments were made, no pricing was agreed upon, and no documents were signed at this time. (Peterman Decl. ¶ 6.)

On October 31, 2018, pursuant to Inland's request, Worthington representative Mr. Libin gave Inland a quote for thirty CNG fuel systems, to be custom built for AJR trucks, at a cost of $41,710 per system, for a total cost of $1,251,300. (Compl. ¶ 20, Ex. A; Takavitz Decl. ¶ 47–48.) The quote noted that Worthington's standard warranty applied to the transaction. (*Id.* ¶ 21, Ex. A; Takavitz Decl. ¶ 26.) The warranty provided that Worthington would designate a third-party to repair or replace any defective CNG fuel systems or components. (*Id.*, Ex. B; Takavitz Decl. ¶ 26.)

On November 5, 2018, Inland's Mr. Abrahams submitted thirty purchase orders to Mr. Takavitz and Mr. Libin. (*Id.* ¶ 23, Ex. C; Takavitz Decl. ¶ 49, Ex. B.) Worthington alleges its Terms and Conditions were applicable to these purchase orders.[3] (*Id.* ¶ 26; Takavitz Decl. ¶ 27.)

Worthington accepted the purchase order, purchased the necessary parts, and immediately began manufacturing the CNG fuel systems. (*Id.* ¶ 31; Takavitz Decl. ¶ 51.) The CNG fuel systems were to be shipped for installation into Kenworth trucks, which though not finalized, would likely have occurred in Chillicothe, Ohio. (*Id.* ¶ 27; Takavitz Decl. ¶ 32.) After installation, the trucks would be shipped to Inland at Worthington's expense. (*Id.* ¶ 28.) Finally, Inland would deliver the completed trucks to AJR in California. (*Id.* ¶ 29.) Due in large part to a build schedule for Kenworth trucks, Inland could not supply the Kenworth trucks that the CNG fuel systems would be installed in until mid-2019. (*Id.* ¶ 30.)

On or about April 5, 2019, Mr. Takavitz informed Mr. Peterman, that at some point in the future Worthington intended to discontinue its business line that designed, manufactured, and

---

[3] The quote Mr. Peterman received on behalf of Inland did not reference or include any terms of conditions. (Peterman Decl. ¶ 22.) Additionally, Mr. Peterman had never seen the Terms and Conditions document to its attachment as an exhibit to the Complaint commencing this lawsuit. (*Id.*)

installed fuel systems. (*Id.* ¶ 33; Peterman Decl. ¶ 17.) On April 11, 2019, Inland informed Worthington, through a notice addressed to Mr. Takavitz in Columbus, Ohio, it was cancelling its purchase orders because AJR "notified Inland that they [sic] [would] not accept [Worthington's] natural gas fuel system to be installed on the vehicles they have ordered." (*Id.* ¶ 38, Ex. E; Takavitz Decl. ¶ 52–53.) Inland stated in the notice that Worthington's departure from the fuel system market was a "substantial and material change in conditions known at the time [AJR] requested Worthington fuel systems to be installed [in] the trucks it had ordered." (*Id.* ¶ 39.) As of April 11, 2019, Worthington had manufactured ten of the thirty CNG fuel stems and had acquired the necessary materials to complete the remaining units. (*Id.* ¶ 43.)

On April 16, 2019, Worthington rejected the cancellation and demanded Inland fulfill its obligations under the agreement. (*Id.* ¶ 41.) Inland did not pay Worthington for the completed CNG fuel systems or the materials acquired to manufacture them. (*Id.* ¶ 42.) Worthington attempted to sell the completed fuel systems but was unable to do so. Worthington was able to sell some, thought not all, of the purchased materials at a heavily discounted price. (*Id.* ¶ 45.)

On August 2, 2019, Worthington sued Inland alleging breach of contract and promissory estoppel. (*Id.* ¶¶ 46–57.)

## II.

Inland requested that the Court take judicial notice of certain documents under Federal Rule of Evidence 201. (Def.'s Req. Judicial Notice at 1, ECF No. 9.) Inland requests the Court take notice of:

> (1) The Complaint in the section styled *AJR Trucking Inc., v. Worthington Industries, Inc., Los Angeles County Superior Court*, Case No. 19 CMCV 00276 . . . (2) the dockets of the actions styled *Avery v. Bernzomatic*, Case No 2:19-cv-016650JAK-RAO; and *Abell v. Worthington Indus., Inc.*, Case No. 2:15-cv-08427-JFW-JEM, each before the United States District Court for the Central District of California . . . [and] (3) the dockets of the actions styled *Sherengo v. Worthington Indus.*, Case No. 18STCV03467; *Holgen v. Worthington Indus.*, Case

6

No. BC610645; *Bailey v. Bernzomatic*, Central District of California Case No. 2:16-cv-01665-JAK-RAO; *Abell v. Worthington Indus.*, Case No. BC588061; and *Vlaisavich v. Coleman Co., Inc.*, Case No. BC573944, each before the Los Angeles County Superior Court."

(*Id.* at 1–2.) Inland attaches to its motion copies of each of these materials. (*See id.* Exs. 1–3.)

Rule 201 provides that "a court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Civ. Pro. 201(b)(1)–(2). Additionally, the rule provides a court "must take judicial notice if a party requests it and the court is supplied with the necessary information." *Id.* at (c)(2). "It is a matter of settled precedent in the Sixth Circuit that courts may take judicial notice of proceedings in other courts." *In re Huffy Corp.*, 577 F. Supp. 2d 968, 981 (S.D. Ohio 2017) (citing *Lyons v. Stovall*, 188 F.3d 327, 333 n.3 (6th Cir. 1999)).

Worthington responded to Inland's request for judicial notice and stated that while it took no objection to the Court taking judicial notice of the public records, it did object to the taking of judicial notice of the facts contained within the documents. (Pls.' Mem. Opp'n at 2, ECF No. 13.) In support, Worthington relies on *Platt v. Bd. of Comm'rs on Grievance & Discipline Ohio Supreme Ct.*, 894 F.3d 235, 245 (6th Cir. 2018), which noted that while courts can take judicial notice of at least some documents of public record, "[s]uch notice . . . is limited; a court may take notice of the documents and what they say but it cannot consider the statements contained in the document for the truth of the matter asserted." *Id.* (internal citations omitted). Inland agrees. (Def.'s Reply Supp. at 3 n.2, ECF No. 14, hereinafter "Def.'s Reply.")

Both parties' arguments are well-taken. The Court GRANTS Inland's request for judicial notice. The Court notices the existence of the documents.

7

**III.**

Inland has moved to dismiss this case for improper venue under Federal Rule of Civil Procedure 12(b)(3), and for lack of personal jurisdiction under Rule 12(b)(2). In the alternative, Inland asks the Court to transfer venue under 28 U.S.C. §§ 1404 and 1406.

### A. Motion to Dismiss for Improper Venue

Whether venue is proper is governed by 28 U.S.C. § 1391. Under this statute, a civil action may be brought in:

1. A judicial district in which any defendant resides, if all defendants are residents of the state in which the district is located;

2. A judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is subject to the action is situated; or

3. If there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b)(1)–(3). For venue purposes, a corporation resides "in any judicial district in which such defendant is subject to the court's personal jurisdiction." *Id.* at § 1391(c)(2). If venue is not proper under one of these sections, the case must be dismissed or transferred. Fed. R. Civ. Pro. 12(b)(3); 28 U.S.C. § 1406(a).

Worthington claims venue is proper in the Southern District of Ohio under § 1391(b)(1) because Inland is subject to personal jurisdiction in Ohio and thus, resides in Ohio. (Pls.' Mem. Opp'n at 12, ECF No. 14, hereinafter "Pls.' Resp.") In addition, Worthington claims venue is proper in the Southern District of Ohio under § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in the Southern District of Ohio. (*Id.* at 21.) Inland maintains venue is improper under either section. (Def.'s Mot. Dismiss at 7, ECF No. 8.)

1. **Venue is Proper if Inland Resides in the Southern District of Ohio, i.e., if Inland is Subject to Personal Jurisdiction in Ohio**

District Courts have discretion to decide questions of personal jurisdiction using the pleadings, permitting discovery in aid of deciding the motion, or conducting an evidentiary hearing to resolve factual questions. *Res. Inst. at Nationwide Children's Hosp. v. Trellis Boiscience, LLC*, No. 2:15-cv-3032, 2016 U.S. Dist. LEXIS 136309, at *8 (S.D. Ohio Sept. 30, 2016). Here, the Court can decide the motion using the pleadings and the declarations submitted by the parties.

Plaintiffs bear the burden of establishing personal jurisdiction. *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1168 (6th Cir. 1988). When personal jurisdiction is decided "solely on written submissions, the plaintiff's burden is 'relatively slight.'" *Res. Inst.*, 2016 U.S. Dist. LEXIS 136309 at *8–9 (citing *id.*). The plaintiff must, "by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen v. Matthews*, 935 F.2d 1455, 1458 (6th Cir. 1991).

"The [C]ourt must view all of the pleadings and affidavits in a light most favorable to the plaintiff, and to defeat dismissal, the plaintiff need only make a *prima facie* showing that personal jurisdiction exists." *Am. Greeting Corp.*, 839 F.2d at 1168; *see also Theunissen*, 935 F.2d at 1458 ("Where the court relies solely on the parties' affidavits to reach its decision, the plaintiff must make only a *prima facie* showing that personal jurisdiction exists in order to defeat dismissal."). The Sixth Circuit adopted this rule "in order to prevent non-resident defendants from regularly avoiding personal jurisdiction simply by filing an affidavit denying all jurisdictional facts." *Theunissen*, 935 F.2d at 1458.

In a diversity case, "[t]o determine whether personal jurisdiction exists over a defendant, Federal Courts apply the law of the forum state, subject to the limits of the Due Process Clause of the Fourteenth Amendment." *CompuServe Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996);

*see also Theunissen*, 935 F.2d at 1459 ("A federal district court sitting in diversity must apply the law of the forum state to determine whether it may exercise jurisdiction over the person of a non-resident defendant."). "Ohio law does not recognize general jurisdiction over a non-resident defendant." *JM-Nipponkoa Ins. Co. v. Dove Transp. LLC.*, No. 1:14-cv-202, 2015 U.S. Dist. LEXIS 3081, at *7 (S.D. Ohio Jan. 12, 2015). Thus, Defendant must be amenable to suit under Ohio's long-arm statute and the requirements of the Due Process Clause must be met. *See id.*

### a. Ohio Long-Arm Statute

Ohio Revised Code § 2307.382 provides for when a court may exercise jurisdiction over a defendant. Worthington argues this Court has jurisdiction over Inland under the section "[t]ransacting any business in [Ohio]." *Id.* at § 2307.382(a)(1). Ohio courts interpret this section broadly. *First Franchise Capital Corp. v. Jack in the Box, Inc.*, No. 1:17-cv-397, 2017 U.S. Dist. LEXIS 120324, at *27 (S.D. Ohio Aug. 1, 2017). In order to satisfy this section, the defendant must "do some act or consummate some transaction within the forum." *Imwalle v. Reliance Med. Prods.*, No. 1:17-cv-397, 2005 U.S. Dist. LEXIS 50526, at *8 (S.D. Ohio Sept. 19, 2005).

In the context of a contract dispute, this Court uses two factors to determine whether an out-of-state defendant transacted any business in Ohio within the meaning of the long-arm statute: (i) whether the out-of-state defendant initiated the business dealing; and (ii) whether the parties conducted their negotiations or discussions in the forum state and on what terms. *First Franchise*, 2017 U.S. Dist. LEXIS 120324 at *27–28.

### i. Initiating Business Dealings in Ohio

"If the defendant reached out to the plaintiff in the forum state to create a business relationship, the defendant transacted business in the forum state." *Paglioni & Assocs. v. Winnercomm, Inc.*, No. 2:06-cv-276, 2007 U.S. Dist. LEXIS 18612, at *25 (S.D. Ohio Mar. 16, 2007). For example, in *Odom Indus. v. Divsersified Metal Prods.*, No. 1:12-CV-309, 2012 U.S.

Dist. LEXIS 135952 (S.D. Ohio Sept. 24, 2012), this Court found that the defendant initiated the business relationship when it solicited a quote from a company in Ohio. *Id.* at \*31–32. Thereafter, the defendant contacted the Ohio company for additional quotes, revised quotes, and negotiations and issued a letter of intent and purchase order to the Ohio company. *Id.* at \*32–33. This Court found Ohio's long-arm statute satisfied and noted "[c]ourts have found personal jurisdiction . . . in a variety of circumstances where the defendants contacts with Ohio were much less substantial than the instant case." *Id.*

Similarly, in *Research Institute at Nationwide Children's Hospital v. Trellis Bioscience, LLC*, the Court found the defendant initiated the business relationship when first a third-party businessman introduced the Ohio based plaintiff and the California based defendant; and second the defendant contacted the plaintiff by email. 2016 U.S. Dist. LEXIS 136309 at \*13. Additionally, the defendant sent electronic communications to Ohio, the communications were received in Ohio, and the parties' agreement affected Ohio. *Id.* at \*15–16. This Court found these facts satisfied the Ohio long-arm statute. *Id.* at \*19.

Worthington contends that Inland initiated the business relationship. (Pls.' Resp. at 13–14.) Worthington argues that first, on October 31, 2016, Kenworth representative Mr. Stevens introduced Worthington and Inland. (Compl. ¶ 14; Takavitz Decl. ¶ 16.) Next, Inland requested information about CNG fuel systems and a quotation for CNG fuel systems from Worthington. (*Id.* ¶ 15; Takavitz Decl. ¶¶ 16, 20, 24, 28.) Worthington argues further that Inland initiated every transaction because whether Worthington manufactured the CNG fuel systems depended first on whether Inland ordered them. (Takavitz Decl. ¶ 25.)

In contrast, Inland argues Worthington initiated the parties' communications through repeatedly dispatching its representatives to California to try to persuade Inland and AJR to

purchase its CNG fuel systems. (Def.'s Mot. Dismiss at 13.) Inland argues the meetings on December 20, 2016, February 23, 2017, March 15, 2017, and April 30, 2017, were Worthington initiating the business relationship. (Peterman Decl. ¶¶ 11–13, 19; Chris Khudikyan Decl. ¶ 9–11.) Additionally, Inland argues the introduction in October of 2016 was unnecessary. (Def.'s Reply at 13.) Worthington and Inland already knew each other because earlier in 2016, Worthington representatives had spoken with another Inland customer, Food Express, about the same fuel systems. (Abrahams Decl. ¶ 6.)

Additionally, Inland argues even if the Court finds the initiation of the business relationship occurred with the request for a quotation, this communication did not occur in Ohio. (Def.'s Mot. Dismiss at 10.) The quotation and accompanying warranty came from Salt Lake City, Utah. (*See* Compl. Exs. A, B.) Additionally, the purchase order came from Burnaby, Canada and was sent to Chicago, Illinois. (*Id.* Ex. C.) Thus, Inland argues, even if it did initiate the business relationship, it did not have substantial contact with Ohio. (Def.'s Mot. Dismiss at 10.)

Viewing the pleadings in the light most favorable to Plaintiff, the Court agrees with Worthington. To begin, the fact that the parties were first introduced by a third party does not defeat Worthington's argument that Inland initiated the business relationship. *See Res. Inst.*, 2016 U.S. Dist. LEXIS 136309 at *13. The initiation of the business relationship occurred when Inland's Mr. Abrahams reached out to Worthington's Mr. Takavitz for information on Worthington's CNG fuel system and a quotation on such systems. *See Odom Indus.*, 2012 U.S. Dist. LEXIS 135952 at *31–32. Mr. Takavitz explains that those at Inland with whom he interacted knew he was based in Columbus, that Worthington was an Ohio based company, and that decisions were made in Ohio. (Takavitz Decl. ¶ 18.) Thus, by contacting Mr. Takavitz, Inland reached into Ohio to transact business there.

Inland's contention that the meetings in California initiated the business relationship is not well-taken because the meetings were subsequent to when Mr. Abrahams solicited Mr. Takavitz for information on the CNG fuel systems and a quote. Further, this contradicts Inland's own contention that Worthington initiated a relationship earlier in 2016. This argument is similarly unpersuasive, however, because Ohio's long-arm statute "contemplates only specific jurisdiction." *Hitachi Med. Syms. Am. v. St. Louis Gynecology & Oncology LLC*, No. 5:09-CV-2613, 2011 U.S. Dist. LEXIS 17022, at *11 (N.D. Ohio Feb. 22, 2011). In other words, "the damages at issue must arise from the defendant's contacts with Ohio, [] there must be a proximate cause relationship between the two." *JM-Nipponkoa Co.*, 2015 U.S. Dist. LEXIS at *11. Neither party alleged any connection between the damages from the alleged breach of contact and the previous contact between the parties for Inland's customer, Food Express. In contrast, the alleged damages arise from the transactions in connection with the CNG fuel systems.

"The question of who initiates the contact . . . is but one factor to be considered and the determination is not always dependent upon who initiates the contact." *Hitachi*, 2011 U.S. Dist. LEXIS 17022 at *13. Thus, the Court must also consider the second factor.

### ii. Negotiations and Discussions in Ohio and Terms which Affect Ohio

"If the parties negotiated in Ohio with provisions [of an agreement] affecting Ohio, the non-resident transacted business in Ohio." *Odom Indus.*, 2012 U.S. Dist. LEXIS 135952 at *29; *see also Paglioni*, 2007 U.S. Dist. LEXIS 18612 at *25 ("If the parties negotiated in the forum state, the defendant transacted business in the forum state."). Importantly, "merely directing communications to an Ohio resident for purpose of negotiating an agreement, without more, is insufficient to constitute 'transacting business.' Rather, there must additionally be some continuing obligation that connects the non-resident defendant to the state or terms of the

agreement that affect the state.'" *Id.* at *29 (citing *Hitachi*, 2011 U.S. Dist. LEXIS 17022 at *14–16); *see also Dayton Superior Corp. v. Yan*, 288 F.R.D. 151, 161 (S.D. Ohio 2012) ("[T]he use of interstate lines of communication such as mail and telephones does not automatically subject a defendant to jurisdiction."); *In-Flight Devices Corp. v. Van Dusen Air.*, 466 F.2d 220, 226 (6th Cir. 1972) (providing that a defendant has transacted business in a state when he or she creates obligations that have a realistic impact on the commerce of that state, and such impact was reasonably foreseeable); *Shaker Const. Grp., LLC v Schilling*, No. 1:08CV278, 2008 U.S. Dist. LEXIS 79645, at *11( S.D. Ohio Sept. 18, 2018) ("Merely directing communications to an Ohio resident for the purpose of negotiating an agreement, without more, is insufficient to constitute 'transacting business' within Ohio.").

For example, in *Odum Industries*, "[t]he terms of the contract were negotiated through communications by [the defendant] with [the plaintiff] in Ohio, and for a two year period . . . [the defendant] reached out to [the plaintiff] multiple times." 2012 U.S. Dist. LEXIS 135952 at *30. Additionally, the contract required the plaintiff to create a product and the defendant to pay the purchase order in three separate payments, and thus, the agreement "created continuing obligations." *Id.* at *31. The Court found the Ohio long-arm statute satisfied.

Similarly, in *Research Institution*, the defendant sent emails to the plaintiff in Ohio, and thus, "direct[ed] [communications] to Ohio," and the plaintiff received the communications in Ohio. 2016 U.S. Dist. LEXIS 136309 at *15. There was also one in-person meeting in Ohio. *Id.* Further, the contract between the parties affected Ohio because a breach would impair an Ohio corporation's confidential information. *Id.* at *16. In considering these facts, plus the fact that the defendant initiated the business relationship in Ohio, this Court determined the defendant had transacted business in Ohio. *Id.* at *17.

14

In contrast, in *Katz v. Meli Investments, LLC,* while the defendant initiated the business transaction by making contact with the plaintiff, whom the defendant knew to be in Ohio, the remaining negotiations took place without a single trip to Ohio. No. 3:08-cv-299, 2009 U.S. Dist. LEXIS 1246, at *19–21 (S.D. Ohio Jan. 9, 2009). Additionally, the subject of the transaction did not affect Ohio for it was a project to be located entirely in New Orleans. *Id.* This Court found the defendant did not transact business in Ohio. *Id.* at *21.

Worthington argues the negotiations took place through electronic communication directed at and received in Ohio, the parties negotiated on two occasions in Ohio, Inland sent the request for a quotation and purchase orders to Mr. Libin, whom it knew worked in Ohio, the contract created continuing obligations in Ohio, and the breach was directed at Ohio.

First, Worthington argues that negotiations and discussions occurred with a party Inland knew to be in Ohio. (Pls.' Resp. at 15.) Worthington points out that Inland called and emailed Ohio-based Worthington personnel, like Mr. Takavitz and Mr, Libin, for the purpose of negotiating orders of CNG fuel systems. (Takavitz Decl. ¶¶ 58–59.) Inland representatives knew the people whom they were directing their communications too were in Ohio. (*Id.* ¶¶ 18, 21, 24.) These communications were received in Ohio and final decisions were made in Ohio. (*Id.* ¶ 25.)

Additionally, Worthington notes there were in-person meetings among representatives from Inland, Worthington, AJR, and Kenworth in Columbus, Ohio in 2018. (Peterman Suppl. Decl. ¶¶ 4–5; Takavitz Decl. ¶¶ 39, 40, 44–45; Jack Khudikyan Suppl. Decl. ¶¶4–5; Chris Khudikyan Decl. ¶ 3.) This visit included a dinner in Columbus, Ohio. (*Id.*) Worthington contends this dinner "focused on the Inland/Worthington relationship and AJR's interest in acquiring [C]NG fuel systems." (Takavitch Decl. ¶ 39.) The representatives "discussed Worthington's [C]NG fuel systems and Worthington's relationship with Inland." (*Id.*) According

to Mr. Takavitch this was a "business dinner" as evidenced by a photo Mr. Peterman put on his social media of the attendees of the dinner captioned "Work, Work, Work." (*Id.* ¶ 40.)

The same Ohio visit also included Worthington representatives giving Inland representatives a tour of Worthington's headquarters. (*Id.* ¶¶ 35–46.) According to Mr. Takavitch, this tour included "lunch, a visit with Worthington's leadership team, [] additional conversations about [C]NG fuel systems and Inland's business relationship with Inland'" and "a presentation" which stated "Worthington is headquartered in Columbus, Ohio." (*Id.* ¶ 42.)

In addition to calls and emails Inland directed to Ohio, and the April 2018 dinner and tour, Worthington points to the fact that Inland sent a request for a price quotation, and eventually purchase orders based on the quotation, to Mr. Libin. (*Id.* ¶¶ 48–49.) Inland representatives knew Mr. Libin worked in Worthington's Columbus, Ohio office. (*Id.*)

Beyond these negotiations in Ohio, Worthington argues Inland's purchase orders resulted in continuing obligations in Ohio. Worthington notes that as soon as the orders were sent to Ohio, Worthington began manufacturing the fuel systems.[4] (*Id.* ¶ 51.) Inland was required to pay for the fuel systems as they were completed. Additionally, once the systems were shipped, if any problems arose, claims for warranty would be managed in Ohio. (*Id.*)

Further, Worthington argues, the cancellation notice was sent to Mr. Takavitz's email as well as addressed to his office in Columbus, Ohio. (*Id.* ¶¶ 52–53.) Finally, Worthington notes that its Terms and Conditions show that Worthington accept orders out of its Columbus, Ohio office and Ohio law applied to disputes. (Compl. ¶ 23, 25; Takavitch Decl. ¶ 50.)

---

[4] The parties are not clear as to where the CNG systems are manufactured. After the CNG systems were manufactured they would likely be sent to Chillicothe, Ohio, to be installed into the Kenworth trucks, though this was not yet finalized. (Takavitz Decl. ¶ 15.) If this is indeed where they ended up being installed this would be another connection to Ohio.

In contrast, Inland argues that negotiations only took place in California, the contract does not affect Ohio, and the Terms and Conditions are irrelevant because it did not receive them.

First, Inland contends "all face-to-face negotiations occurred in California." (Def.'s Mot. Dismiss at 14.)  Inland characterizes the 4 meetings in California, prior to its purchase orders, as all of the negotiations. (Peterman Decl. ¶¶11–13, 19; Chris Khudikyan Decl. ¶ 9–11.)  Inland also strongly contests Worthington's characterization of the April 17 and 18, 2018, Ohio-based meeting as involving any negotiations.  Inland submits declarations from multiple individuals who attended the dinner stating it was not a business dinner and instead simply a social outing where negotiations were not performed. (Peterman Suppl. Decl. ¶¶ 4–5; Abrahams Decl. ¶¶ 4–5; Jack Khudikyan Decl. ¶¶ 4–5; Chris Khudikyan Suppl. Decl. ¶ 3.)

Inland contends the caption of the dinner photo—"Work, Work, Work"—was a joke because no one was doing any work. (Peterman Supp Decl. ¶ 4.)  Inland also notes that the purchase order did not occur immediately after this visit.  Instead, there were two more meetings in California which then lead to Inland's purchase of CNG fuel systems. (Peterman Decl. ¶ 15.)

Additionally, Inland contends that the contract at issue does not affect Ohio.  The CNG fuel systems are put into trucks which, aside from the test truck which entered Oregon and Washington, are only ever driven in California. (Khudikyan Decl. ¶ 21.)

Finally, Inland contends it never received the Terms and conditions and Worthington has not provided any evidence that it saw them or agreed to them. (Def.'s Reply at 14.)

This case presents a close call.  The Court finds, however, that due to the requirement that the Court view the pleadings in the light most favorable to the Plaintiff, Inland transacted business in Ohio.  *Greeting Corp.*, 839 F.2d at 1168; *Theunissen*, 935 F.2d at 2458.  Email and phone communications, alone, are not enough to show a transaction of business in Ohio.  *Shaker*, 2008

U.S. Dist. LEXIS 79645 at *11. Plaintiffs, however, have also demonstrated that negotiations occurred in Ohio and the parties' agreement created continuing obligations in Ohio for both parties.

The Court agrees with Worthington that Inland sent electronic communications to Worthington representatives it knew to work in Ohio, and those communications were received in Ohio. Additionally, like in *Research Institute*, there were two, in-person meetings in Columbus, Ohio in April of 2018. 2016 U.S. Dist. LEXIS 136309 at *15 (electronic communications directed at and received in Ohio coupled with one in-person meeting and continuing obligations found sufficient). Taking the pleadings and declarations in the light most favorable to Plaintiff, the dinner on April 17, 2018, involved negotiations for the purchase by Inland of CNG fuel systems. Additionally, even if this was just a personal dinner, the next day Inland representatives went to Worthington's headquarters where they were introduced to the leaders there. After this point, when Inland ordered CNG fuel systems, Inland was transacting business in Ohio. Inland knew the decisions about their order would be made in Columbus, Ohio, as the leadership was there.

As such, when Inland contacted Alex Libin, a representative of Worthington whom it knew worked in Columbus, Ohio, to obtain a quotation for CNG fuel systems, Inland transacted business in Columbus. Ohio. (Takavitch Decl. ¶ 48.) Similarly, when Inland submitted purchase orders to Mr. Libin and Mr. Takavitch, it knew it was ordering CNG fuel systems from two Worthington representatives whom it knew worked in Columbus, Ohio based on their past communications with these individuals and their trip to Ohio. (*Id.* ¶ 49.) Similarly, when Inland sent a cancellation notice to Mr. Takavitz it knew it was directing this to Ohio. These points are true even if different addresses are listed on these documents.

Finally, the contract creates continuing obligations in Ohio. Like in *Odom Industries*, the defendant, Inland, had a continuing obligation to pay for the CNG fuel systems as they were delivered. 2012 U.S. Dist. LEXIS 135952 at *30.

Inland's argument that negotiations took place solely in California is not persuasive. In addition to the fact that Plaintiff has provided allegations to the contrary, the numerous contacts in California do not take personal jurisdiction away from Ohio as long as the long-arm statute and due process are satisfied. In fact, it is likely California has personal jurisdiction over Worthington, but this does not mean that this Court cannot also have personal jurisdiction over Inland.

Additionally, Inland's argument that the April 2018 meetings involved no negotiations is not persuasive because the Court must look to the pleadings and supporting declarations in the light more favorable to Worthington. Otherwise, the Court would allow a non-resident defendant to avoid personal jurisdiction simply by filing declarations denying the jurisdictional facts, which is what the Sixth Circuit sought to avoid by invoking the rule that the pleadings should be viewed in the light more favorable to the plaintiff. *See Theunissen*, 935 F.2d at 2458. Thus, the Court must assume the April 2018 meeting involved business negotiations as Worthington contends.

Inland also argues that this contract only affects California as the trucks which will contain the CNG fuel systems will be driven solely in California. This leaves out the fact, however, that commerce in Ohio is affected. *See In-Flight Devices Corp.*, 466 F.2d at 226. The purchase order was processed in Columbus, Ohio. (Takavitz Decl. ¶ 42.) Worthington included a warranty with each order in which the buyer could submit a claim, and personnel in Ohio would organize a repair. (*Id.* ¶ 26.) Additionally, Inland was obligated to pay for each system as Worthington completed

it, which created a continuing obligation. (*Id.*)  Thus, Inland's arguments do not overcome the Court's finding that Inland transacted business in Ohio. [5]

Ohio's long-arm statute is satisfied, thus, the Court must determine whether exercising jurisdiction comports with due process. *Theunissen*, 935 F.2d at 1459.

### b. Due Process Clause

There are two categories of personal jurisdiction: general personal jurisdiction and specific personal jurisdiction. *See First Franchise*, 2017 U.S. Dist. LEXIS 120324 at *46 (citing *Daimler AG v. Bauman, U.S.,* 571 U.S. 117, 118 (2014)).  Worthington claims the Court has specific jurisdiction over Inland, thus the Court will limit its due process analysis to specific jurisdiction. *See id.*  "Specific jurisdiction exists when a claim arises from or relates to the defendant's contacts with the state.  *Id.* (citing *Gold Medal Prods Co. v. Bell Flavors & Fragrances, Inc.*, No. 1:16-CV-365, 2017 U.S. Dist. LEXIS 57640, at *12 (S.D. Ohio Apr. 14, 2017)).

The Court examines the Due Process Clause "recognizing that a defect of this type would foreclose the exercise of personal jurisdiction even where a properly construed provision of the long-arm statute would otherwise permit it." *Theunissen*, 935 F.2d at 1459.  "[T]he crucial federal constitutional inquiry is whether, given the facts of the case, the nonresident defendant has sufficient contacts with the forum state such that the district court's exercise of jurisdiction would comport with 'traditional notions of fair play and substantial justice.'" *CompuServe Inc.,* 89 F.3d at 1263 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  Courts employ three criteria to make this determination:

> (1) [T]he defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state;
>
> (2) [T]he cause of action must arise from the defendant's activities there; and

---

[5] The Court makes this finding without Worthington's contentions about the Terms and Conditions.  Worthington has not contended how the Terms and Conditions became part of the contract.

(3) [T]he acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum to make the exercise of jurisdiction over the defendant reasonable.

*In-Flight Devices*, 466 F.2d at 2256.

### i. Purposeful Availment to the Forum State

In order for a defendant to purposefully avail itself to the forum state's jurisdiction, the court must find "the contacts proximately result[ed] from actions by the defendant *himself* that create a 'substantial connection' with the forum state." *Burger King Co. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (emphasis in original). In addition, these contacts must be of the character that the defendant "should reasonably anticipate being hauled into court" in that state. *Id.* at 474. "Courts require purposeful availment to insure that 'random,' 'fortuitous,' or 'attenuated' contacts do not cause a defendant to be hauled into a jurisdiction." *CompuServe Inc.*, 89 F.3d at 1263 (citing *Id.* at 475). In analyzing this factor courts require more than the mere existence of contacts with the forum state and instead "inquire[] into the quality of those contacts." *Burnshire Dev. LLC v. Cliffs Reduced Iron Corp.*, 198 F. App'x 425, 431 (6th Cir. 2006).

The Sixth Circuit has held that "the Ohio 'transacting any business' standard is coextensive with the purposeful availment prong of constitutional analysis." *Burnshire*, 198 F. App'x at 432. Accordingly, "there is no need to do a separate purposeful-availment analysis." *Odom Indus.*, 2012 U.S. Dist. LEXIS 135952 at *38–39. Inland purposefully availed itself of the privilege of conducting business in Ohio because it transacted business in Ohio. *See id.*; *see also Res. Inst.*, 2016 U.S. Dist. LEXIS 136309 at *23 ("Given that [the defendant] has transacted business within the meaning of the Ohio long-arm statute, [the defendant] has also purposefully availed itself o the privilege of acting in Ohio.").

21

### ii. Cause of Action Arises from Contacts with the Forum State

In general, "an action will be deemed not to have arisen from the defendant's contacts with the forum state only when [the contacts] are unrelated to the operative facts of the controversy." *Creech v. Roberts*, 908 F.2d 75, 80 (6th Cir. 1990). "This factor does not require that the cause of action formally arise from defendant's contacts with the forum; rather, this criterion requires only that the cause of action, of whatever type, have a substantial connection with the defendant's in-state activities." *Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002).

This requirement is met. Inland's contacts with Ohio arose from the transaction at issue and the negotiations that lead up to it. *See Odom Indus.*, 2012 U.S. Dist. LEXIS 135952 at *40.

### iii. Exercise of Jurisdiction is Reasonable

The defendant's acts must be substantial enough such that jurisdiction is reasonable. *In-Flight Devices*, 466 F.2d at 2256. "Sixth Circuit precedent dictates that when applying this third prong, 'where the first two criteria are satisfied only the unusual case will not meet third criteria.'" *Odom Indus.*, 2012 U.S. Dist. LEXIS 135952 at *40 (citing *Aristech Chem. Int'l Ltd. v. Acrylic Fabricators Ltd.*, 138 F.3d 624 (6th Cir. 1998)). This factor of the due process analysis "looks to the extent of the forum state's interest and whether exertion of jurisdiction over the particular defendant is fair." *First Nat'l Bank v. J.W. Brewer Tire Co.*, 680 F.2d 1123, 1126 (6th Cir. 1982).

In considering whether the exercise of jurisdiction over a defendant is fair, courts typically consider: "(1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the controversy." *Intera Corp. v. Henderson*, 428 F.3d 605, 618 (6th Cir. 2005).

The Sixth Circuit has "deemed specific jurisdiction to be proper even when a defendant would be compelled to travel." *Intra Corp.*, 428 F.3d at 618. Thus, while in this case Inland may be burdened by being required to travel to Ohio this does not prevent a finding that the Court's exercise of personal jurisdiction over Inland is reasonable.

"A state's interest in resolving suits brought by its residents weighs in favor of a finding of personal jurisdiction." *Odom Indus.*, 2012 U.S. Dist. LEXIS 135952 at *41. "Ohio has a strong interest in resolving suits brought by its residents and has a substantial interest in seeing that its residents get the benefit of their bargains." *Id.* Here, Ohio has an interest in ensuring Worthington gets the benefit of its bargain. Additionally, Worthington has an interest in obtaining relief in Ohio and Ohio has an interest in ensuring the resolution of this claim is efficient.

In sum, this is not the unusual case where the first two due process requirements are met and third is not. All three factors are met. Thus, this Court's exercise of personal jurisdiction over Inland comports with due process.

Inland is subject to personal jurisdiction in Ohio, which makes it a resident for purposes of venue under § 1391(b)(1). Thus, because venue is proper under § 1391(b)(1), the Court need not determine whether venue is also proper under § 1391(b)(2). Importantly, when "the court issues a pretrial order denying the defendant's 12(b)(2) motion, the defendant may proceed to trial without waiving the defense." *Serras v. First Tenn. Bank Nat'l Ass'n*, 872 F.2d 1212, 1214 (6th Cir. 1989). "A threshold determination that personal jurisdiction exists does not relieve [the plaintiff] . . . at the trial of the case-in-chief from proving the facts upon which jurisdiction is based by a preponderance of the evidence." *Id.* (internal citations omitted); *see also McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936) (noting that the party asserting jurisdiction "must carry throughout the litigation the burden of showing he is properly in court"). Thus,

"Defendant may proceed to trial without waiving lack of personal jurisdiction as a defense."
*Imwalle*, 2005 U.S. Dist. LEXIS 50526 at *13.

Venue is proper.  28 U.S.C. § 1391(b)(1).  The motion to dismiss for improper venue is
DENIED.

### B.  Motion to Dismiss for Lack of Personal Jurisdiction

In addition to moving to dismiss for improper venue, Inland moves to dismiss for lack of
personal jurisdiction.  This Court has already found it has personal jurisdiction over Inland.  *See*
*infra* Section III.A.1.  Thus, the motion to dismiss for lack of personal jurisdiction is DENIED.

### C.  Motion to Transfer Venue

Defendant has moved, in the alternative to dismissal, to transfer the case to the Central
District of California pursuant to 28 U.S.C. § 1404.  (Def.'s Mot. Dismiss at 19.)  Section 1404
provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district
court may transfer any civil action to any other district or division where it might have been
brought." 28 U.S.C. § 1404(a).  "The moving party has the burden of establishing the need for a
transfer of venue." *Jamhour v. Scottsdale Ins. Co.*, 211 F. Supp. 2d 941, 945 (S.D. Ohio 2002).

A district court has broad discretion to decide whether to grant or deny a motion to transfer
pursuant to § 1404(a). *See Phelps v. McClellan,* 30 F.3d 658, 663 (6th Cir. 1994).  "In ruling on
a motion to transfer under § 1404(a), a district court should consider the private interests of the
parties, including their convenience and the convenience of potential witnesses, as well as other
public-interest concerns, such as systemic integrity and fairness, which come under the rubric of
'interests of justice.'" *Moses v. Bus. Card Express, Inc.,* 929 F.2d 1131, 1137 (6th Cir. 1991)
(quoting *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 30 (1988)).  "The Court must give
foremost consideration to the plaintiff's choice of forum and the balance must weigh 'strongly in
favor of a transfer' before the Court should grant a [§] 1404(a) motion." *W. & S. Life Ins. Co. v.*

*Morgan Stantley Mortg. Capital, Inc.*, No. 1:11-cv-576, 2011 U.S. Dist. LEXIS 146213, at *11 (S.D. Ohio Dec. 20, 2011). In order to transfer a case "[t]he proposed forum must be 'a more convenient forum, not [simply] a forum likely to prove equally convenient or inconvenient." *Res. Inst.*, 2016 U.S. Dist. LEXIS at *30 (citing *Van Dusan v. Barrack*, 376 U.S. 612, 645–46 (1964)).

"Courts interpreting [§] 1404(a) must engage in a two-step analysis and determine: (1) whether the action might have been brought in the proposed transferee court; and (2) whether considering relevant factors, the balance of convenience and the interests of justice 'strongly' favor transfer." *P&G Co. v. Team Techs., Inc.*, No. 1:12-cv-552, 2012 U.S. Dist. LEXIS 167208, at *6 (S.D. Ohio Nov. 26, 2012).

### 1. Bringing this Action in the Central District of California

An action "might have been brought" in a transferee court if: (1) the court has jurisdiction over the subject matter of the action; (2) venue is proper there; and (3) the defendant is amenable to process issuing out of the transferee court. *Jamhour*, 211 F. Supp. 2d at 945.

The Central District of California would have diversity jurisdiction over this action since the parties are citizens of different states. *See* 28 U.S.C. § 1332(a)(1). Venue would also be proper under 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to this claim occurred in California.[6] This included at least eight meetings in California attended by both Worthington and Inland representatives for the purpose of discussing the CNG fuel systems. (*See* Peterman Decl. ¶¶ 9, 11–13, 15; Chris Khudikyan Decl. ¶¶ 9–11, 14–15.) Finally, Inland is amenable to process in California as it has three offices there and many representatives such as Mr. Peterman. Fed. R. Civ. Pro. 4(h). This first factor is satisfied.

---

[6] This is true even if a substantial part of the events giving rise to this claim also occurred in Ohio. "The fact that substantial activities took place in Ohio does not disqualify [California] as a proper venue as long as 'substantial' activities took place in [California] too." *Jamhour*, 211 F. Supp. 2d at 945.

### 2. Convenience of the Parties and Interests of Justice

When considering whether to transfer, courts consider the private interests of the parties and the public interest in the administration of justice. *See Jamhour*, 211 F. Supp. 2d at 945.

#### i. Private Interests

The private interests for courts to consider in deciding whether to transfer a case include:

> The relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing witness; possibility of view of the premises, if view would be appropriate to the action; and all other practical problems that make trial of the case easy, expeditious, and inexpensive.

*Id.* (citing *Gulf Oil v. Gilbert*, 330 U.S. 501, 508 (1947)). Courts have stated the private interests in different ways, but the following private factors are most relevant in this case: (a) convenience for the witnesses; (b) location of evidence; and (c) the parties' convenience preferences.

#### a. Convenience of the Witnesses

The location of witnesses, specifically non-party witnesses, is a particularly important factor in the transfer analysis. *EGRSCO, LLC v. Evans Garment Restoration, LLC*, No. 2:09-CV-358, 2009 U.S. Dist. LEXIS 94507, at *18–19 (S.D. Ohio Oct. 8, 2009) (noting the importance of essential non-party witnesses); *Smith v. Kyphon, Inc.*, 578 F. Supp. 2d 954, 963 (S.D. Ohio 2008) ("Convenience of *non-party* witnesses, as opposed to employee witnesses, is one of the most important factors in the transfer analysis.") (emphasis in original). The party seeking transfer, "must clearly specify the essential witnesses to be called and must make a general statement of what their testimony will cover." *Smith.*, 578 F. Supp. 2d at 963.

Inland argues that all of its potential witnesses are located in California, and all of Worthington's potential witnesses spend a considerable time in California. (Def.'s Mot. Dismiss at 22.) Inland identifies the following potential witnesses:

1. Chris Khudikyan, the president of AJR, who attended eight meetings in Southern California where Worthington and Inland representatives discussed CNG fuel systems–works in Compton, California.

2. Jack Khudikyan, the vice president of AJR, who attended multiple meetings in Southern California where Worthington and Inland representatives discussed CNG fuel systems–works in Compton, California.

3. Marcus Lionetti, the director of fleet services for AJR, who attended multiple meetings in Southern California where Worthington and Inland representatives discussed CNG fuel systems–works in Compton, California.

4. Kyle Takavitz, the director of Worthington's fuel division, who attended eight meetings in Southern California where he met with representatives from AJR and Inland to discuss CNG fuel systems–works in Columbus, Ohio but spends considerable time in Southern California.

5. Jim Rike, Worthington's director of business development, who made multiple trips to Southern California where he met with AJR and Inland representatives and represented Worthington at an expo in Long Beach, California.

6. Alex Libin, one of Worthington's national account managers who made multiple trips to Southern California to meet with AJR and Inland representatives.

7. Michael Sullivan, one of Worthington's national account managers, who hosted crash tests the representatives attended conducted in Adelanto, California.

8. John Coursen, Worthington's Cylinder's project manager, who hosted AJR and Inland representatives for a tour of Worthington's production facility in Pomona California–works in Pomona, California.

(*Id.* at 22–23 (citing Chris Khudikyan Decl. ¶¶ 7, 9–11, 14–15, 17, 21; Peterman Decl. ¶¶ 5, 7–9, 11–13, 15).)  Inland argues third party witnesses, such as Chris Khudikyan, Jack Khudikyan, and Marcus Lionettie's location are particularly important.  (Def.'s Reply at 7–8.)

Inland also notes that the only witness which is clearly Ohio-based is Mr. Takavitz and he frequently travels to Southern California for business.  (Peterman Decl. ¶¶ 8–9, 13, Ex. C; Chris Khudikyan Decl. ¶¶ 7, 10–11, 15, 19.)

In contrast, Worthington argues "the witnesses in this case involve representatives from Inland and Worthington, which are the only parties to the contract alleged in the Complaint." (Pls.' Resp. at 26.)  Worthington asserts these witnesses will testify about events leading up to the contract, whether Worthington began manufacturing the CNG fuel systems, and whether Inland canceled the purchase orders. (*Id.* at 26–27.)  Worthington also contends that AJR is not a party to the contract and thus many of Inland's listed witnesses are not relevant. (*Id.* at 27.)  Finally, Worthington contends in either case someone will be inconvenienced but shifting inconveniences is not enough to support a transfer in venue. (*Id.*)

Inland's arguments are well-taken.  Inland has identified several witnesses who are not employees of Worthington or Inland who would be inconvenienced by having to travel to Ohio. These witnesses work in Southern California.  Inland has described the testimony these witnesses may give by describing the relevant events they attended.  Despite Worthington's contention that Inland overemphasizes the importance of AJR in this lawsuit, the pleadings and declarations allege they were involved in many of the events leading up to the contract and the fall-out between the parties.  Worthington itself states the relevant witnesses will testify about events leading up to the contract and these AJR employees Inland asserts are potential witnesses were present at the events leading up to the contract.  It is clear that AJR employees, while not parties to the contract in question, still hold relevant information that may assist a fact-finder in deciding this case.

Additionally, Chris Khudikyan, in his declaration, while not stating he would refuse to testify in Ohio does state it would be "unfair and unduly burdensome" to require him to travel to Ohio as AJR already has a lawsuit pending in California. (Chris Khudikyan Decl. ¶ 22; *see* ECF. 9-1.)  This lawsuit is against Worthington. (*Id.*)  Thus, it is possible that these AJR employees could be unable to travel to Ohio due to their own litigation occurring in California. *See EGRSCO,*

2009 WL 3259423 at *6 (this factor considers "the extent that witnesses may actually be unavailable for trial in one of the fora").

Worthington contends its employees work in Ohio. Inland points out, however, some of Worthington's employees relevant to this case work in Southern California. Further, the Court is more concerned with the convenience of non-parties, rather than the parties' employees. *See EGRSCO*, 2009 U.S. Dist. LEXIS 94507 at *18–19; *Smith*, 578 F. Supp. 2d at 963. In sum, the convenience of the witnesses' factor weighs in favor of transfer.

### b. Location of Evidence

The ease of access to evidence is an important private factor. *See Jamhour*, 211 F. Supp. 2d at 947. The location of documentary evidence, however, is not as persuasive as the location of physical evidence, because documentary evidence can easily be transferred. *Shonac Corp. v. Maersk, Inc.*, No. C-2-99-870, 2000 WL 1457000, at *5 (S.D. Ohio Sept. 25, 2000) ("[T]he location of documentary evidence is not a factor because documents may easily be sent by mail, copied, or even faxed to a remote location.") (internal citations omitted); *EGRSCO*, 2009 U.S. Dist. LEXIS 94507 at *20 (noting that the locations of records to be introduced at trial is persuasive "only to the extent that the files could not be produced in the alternative forum").

Inland argues the evidence relevant to this case is located in California. (Def.'s Mot. Dismiss at 23.) Inland identifies the CNG fuel systems, the Kenworth trucks containing those fuel systems and the records pertaining to the operation of those trucks as the relevant evidence, which is all maintained in California. (*Id.*) Inland notes specifically that while eDiscovery may assist in the discovery of the documentary records, it will not assist in discovery of the actual trucks or fuel systems. (Def.'s Reply (citing Chris Khudikyan Decl. ¶ 3).) In contrast, Worthington contends

"the exchange of information is straight-forward in light of technological advances and e-discovery." (Pls.' Resp. at 26.)

The Court finds it is likely that both Worthington and Inland, and non-parties such as AJR and Kenworth, have documents relevant to this case. Regardless of where these documents are located, they can easily be duplicated and used in the Southern District of Ohio. *EGRSCO*, 2009 U.S. Dist. LEXIS 94507 at *20–21 (finding the location of evidence did not weight in either direction because documents are easily duplicated); *Res. Inst.*, 2016 U.S. Dist. LEXIS 136309 at *32–33 (finding the evidence factor neutral because while some evidence was located in the potential transferee court, "much of that evidence could easily be sent by mail or email to the Southern District of Ohio").

Inland asserts, however, the trucks and fuel systems are in California. Inland does not describe how the actual trucks and fuel systems will be needed in litigation over an alleged breach of contract. Thus, the location of evidence factor weighs only very slightly in favor of transfer.

### c. The Parties' Convenience and Preferences

This Court has stated that "[w]hat weight to give the plaintiff's choice of forum is a question that has produced considerable disagreement," and "[t]here is no one formulation that courts consistently follow when considering" this factor. *Bath & Body Works*, 2000 U.S. Dist. LEXIS 20168 at *40–41. This Court has also noted that "[w]hen a cause of action has little connection with the forum, plaintiff's choice of forum is entitled to no greater weight than any other factor." *Id.* at *42; *Shonac Corp.*, 2000 WL 1457000 at *4.

Inland argues that Worthington's choice of forum should be discounted because the events giving rise to its claim did not take place in Ohio. (Def.'s Mot. Dismiss at 23.) Inland contends the events giving rise to this lawsuit occurred in California. (*Id.*) Inland notes that the goods were sold to the Kenworth dealership in Southern California and intended for use in California by a

California Corporation. (Chris Kdudikyan Decl. ¶¶ 9–11, 14–15, 17, 20–21, Ex. C; Peterman Decl. ¶¶ 4–5, 7–9, 11–13, 15.) Additionally, Worthington sent representatives to market the goods in Southern California and is being sued in California for its actions in connection with these transactions. (*Id.*) Thus, Inland argues that "[g]iven the very tenuous relationship between the claims asserted and this state, the Court should give Worthington's venue choice very little weight." (Def.'s Mot. Dismiss at 24.)

Finally, Inland argues that its preference for California should also be considered. (Def.'s Reply at 6 (citing *Cole v. JPMorgan Chase Bank NA*, No. 2:15-cv-2634, 2016 WL 4491731, at \*10 (S.D. Ohio Aug. 25, 2016) ("The Court considers the following interests of the litigants . . . defendant's preference.").) Inland argues California is convenient for it because Inland has a presence in California. (*Id.*) Further, litigation in California will be no more inconvenient for Worthington than litigation in Ohio, for Worthington has offices and employees in both locations. (*Id.* at 6–7.) In contrast, Inland has no offices or employees in Ohio. (*Id.*) Additionally, Worthington is already being sued in California. (*See* ECF Nos. 9-1, 9-2, 9-3.)

Worthington contends that its selection is entitled to substantial consideration, in fact greater than any other factor, and the remaining factors do not overcome its selection. (Pls.' Resp. at 26 (citing *see Shuttle v. Armco Steel Corp.*, 432 F.2d 22, 25 (3d Cir. 1970) ("It is black letter law that a plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request, and that choice should not be lightly disturbed."); *Maxchief Invs. Ltd. v. Plastic Dev. Grp., LLC*, No. 3:16-cv-63, 2016 WL 7209553, at \*4 (E.D. Tenn. Dec. 12, 2016) ("[A] plaintiff's choice of venue receives greater weight than other factors.").)

In addition, Worthington contends "Inland is certainly capable of litigating in the Southern District of Ohio." (Pls.' Resp. at 26.) Worthington argues Inland touts itself as selling trucks

across North American, it can travel to Ohio as shown by its trip to visit Worthington's factory, and it can obtain local counsel in Columbus and Cincinnati. (*Id.*)

Inland would prefer to litigate in California and Worthington would prefer to litigate in Ohio. Worthington's preference is entitled to deference. *Cole*, 2016 WL 4491713 at *10 ("Plaintiff's choice to litigate in the state of Ohio is generally entitled to substantial deference."). In this case, however, the strength of Worthington's preference is weakened because the cause of action appears to have a significant connection with Southern California. Many of the parties' negotiations and discussions took place in California, the subject-matter of the contract is used there, and many of the individuals involved in the litigation work there. Additionally, the alleged breach of the contract occurred from a party located in California through communications sent from California. Thus, the Court believes the parties' interests and choices of forum are entitled to equal weight in this instance and the parties; conveniences and preferences factor is neutral.

### ii. Public Interests

The public interests for courts to consider in deciding whether to transfer a case include:

Docket congestion, the burden of trial to a jurisdiction with no relation to the cause of action, the value of holding trial in a community where the public affected live, and the familiarity of the court with controlling law.

*Jamhour*, 211 F. Supp. 2d at 945 (citing *Gulf Oil v. Gilbert*, 330 U.S. 501, 508 (1947)). The most relevant public factors in this case include: (a) court congestion; (b) applicable law; and (c) courts interests in this matter.

### a. Court Congestion

Inland states that according to the Federal Court Management Statistics, the Southern District of Ohio is 43% more congested than the Central District of California. (Def.'s Reply at 9.) Worthington, in contrast, citing no basis for the assertion, states "Worthington believes the

docket in the Southern district of Ohio is no more congested than the Central District of California." [7]  (Pls.' Resp. at 2.)

This Court has previously used the Federal Court Management Statistics to evaluate docket congestion for purposes of deciding whether to transfer a case. *See Bath & Body Works*, 2000 WL 1810489 at *14; *Cole*, 2016 WL 4491731 at *12. Thus, due to the docket congestion being slightly higher in the Southern District of Ohio, this factor weighs slightly in favor of transfer.

### b. Applicable Law

Worthington's Terms and Conditions state that Ohio law will control the contract's interpretation. (Compl. Ex. D.) Worthington argues therefore, that Ohio law controls this dispute. (Pls.' Resp. at 28.)  Inland argues it never received the Terms and Conditions and has never seen or heard of them until this case was filed. (Def.'s Reply at 10 (citing Peterman Decl. ¶ 22).)  The Court finds nothing, and Worthington points to nothing, in the Complaint or any of the declarations which shows anyone from Inland saw the Terms and Conditions or in any way agreed to them or is bound by them. Thus, at this point Plaintiff not shown any reason why the Terms and Conditions is part of the contract between the parties. Thus, Ohio law does not automatically apply.

Generally, "a diversity case should be decided by a court which is most conversant with the applicable state law." *Midwest Motor Supply Co. v. Kimball*, 761 F. Supp. 2d 1316, 1318–19 (S.D. Ohio 1991).  In order to determine which state law's choice of law principles are applicable, "[a] federal court sitting in diversity must apply the law of the forum state." *Jamhour*, 211 F. Supp. 2d at 949; *Baker v. Hughes Inc. v. S&S Chem., LLC*, 865 F.3d 554, 560 (6th Cir. 2016). When a diversity case is transferred, the transferee court applies the same law the transferor court

---

[7] Comparing the dockets of two district courts is difficult.  The undersigned is obviously more familiar with the Southern District of Ohio's docket than that of the central district of California.  The cases in this district include over 6,000 hernia mesh MDL cases, which may cause an overstatement of docket congestion.  This district court does not have difficulty moving cases in a timely manner.

would have applied. *Id.* Thus, Ohio choice of law principles will determine which law should be applied to this case whether this case is transferred or not.

The Ohio Supreme Court held that Ohio courts should use the Restatement (Second) of the Law of Conflicts to answer conflict of laws questions. *Macurdy v. Skiv & Love, P.A.*, 894 F.2d 818, 820 (6th Cir. 1990); *Morgan v. Biro Mfg. Co., Inc.*, 474 N.E.2d 286 (Ohio 1984); *Jamhour*, 211 F. Supp. 2d 949. For choice of law questions in contractual causes of action, the Ohio Supreme Court has adopted sections 187 and 188 of the Restatement. *Jamhour*, 211 F. Supp. 2d 949; *Schulke Radio Prod. Ltd. v. Midwestern Broad. Co.*, 453 N.E.2d 683 (1983) (adopting section 187); *Gries Sports Ent. Inc., v. Modell*, 473 N.E.2d 807 (1984) (adopting section 188).

Section 188 provides that in absence of effective choice of law by the parties, their rights and duties under the contract are determined by the law of the state that has "the most significant relationship to the transaction and parties." Restatement (Second) of Conflicts § 188. Specifically, the Restatement provides the court should consider:

> i. the place of contracting;
>
> ii. the place of negotiations of the contract;
>
> iii. the place of performance;
>
> iv. the location of the subject matter of the contract; and
>
> v. the domicile, residence, nationality, place of incorporation and place of business of the parties.

*Id.* § 188(2).

Additionally, the Restatement directs the Court to follow these instructions:

> i. A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
>
> ii. When there is no such directive, the factors relevant to the choice of the applicable rule of law include:

1. the needs of the interstate and international systems;

2. the relevant policies of the forum;

3. the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;

4. the protection of justified expectations;

5. the basic policies underlying the particular field of law;

6. certainty, predictability, and uniformity of result; and

7. ease in the determination and application of the law to be applied.

(*Id.* § 6.)  In sum, "within that framework, a judge must balance principles, policies, factors, weights, and emphasis to reach a result, the derivation of which, in all honesty, does not proceed with mathematical precision." *Med. Mutual v. Denise DeSoto*, 245 F.3d 561, 571 (6th Cir. 2001).

Here, looking to the place of contracting and the place of the negotiations, the Court finds a substantial amount of the parties' negotiating was done in California.  While there were one or two meetings in Ohio and electronic communication that was directed at and received in Ohio, there was at least eight meetings in California and electronic communication directed at and received in California as well.  (*See* Peterman Decl. ¶¶ 8–11; Chris Khudikyan Decl. ¶¶ 7–11; Takavitz Decl. ¶¶ 39–42, 47–48.)  Additionally, the contracting was done through a serious of electronic exchanges such as price quotes and purchase orders.  The quote was submitted by an individual in Ohio to an individual in California and the purchase orders were submitted by an individual in California to two individuals in Ohio.  (Takavitz Decl. ¶¶ 47–49; Compl. ¶¶ 20–23, Exs. A, B.)  These documents, however, listed additional addresses such as an office in Salt Lake City, Utah and Chicago, Illinois, and thus their connection to either state is weakened.  (*See id.*)  In total, the places of contracting and the places of negotiations is somewhat inconclusive, though

leaning toward California due to the large amount of in-person meetings which occurred there. *See Jamhour*, 211 F. Supp. 2d at 250 (finding that because most of the contracting and negotiation was done over telephone, the information was inconclusive).

Next, the Court looks to the place of performance of the contract. Under the contract Worthington was to manufacture the number of CNG fuel systems Inland ordered, which required purchasing materials, manufacturing the systems, delivering the fuel systems to the location where they would be installed into the trucks, and then organizing delivery to Inland. (Compl. ¶¶ 27–28, 32; Takavitz Decl. ¶¶ 32, 51.) Additionally, Worthington was to be continually liable for organizing repairs of the CNG fuel systems. (*Id.* ¶¶ 21–22.) Beginning with Worthington's first two obligations, Worthington's Complaint and supporting declaration does not allege where the materials would be purchased or where the CNG fuel systems were manufactured. Mr. Peterman's declaration notes Worthington has a manufacturing facility in Pomona, California, but it is unclear if the CNG fuel systems at issue here were manufactured there. (Peterman Decl. ¶ 12.) As to installation, the parties had yet to decide where the fuel systems would be installed into the trucks, but they were leaning toward a facility in Chillicothe, Ohio. (Takavitz Decl. ¶ 51.) As to delivery, the trucks were delivered to Inland, in California. (Compl. ¶ 28.) As to the final obligation, the warranty, Worthington would process the warranty requests in Ohio. (Takavitz Decl. ¶ 26.) In sum, Worthington had obligations in Ohio and California.

Inland's performance was to pay for the systems it ordered. (Compl. ¶ 42.) Though not alleged in the pleadings, it seems likely the payment would go to the same place as the purchase orders, which as described above, were sent to Ohio personnel with an address outside of Ohio.

This analysis of the parties' obligations under the contract shows some of the obligations occurred in California, and some in Ohio. The results are inconclusive, though it seems slightly more obligations were to occur in Ohio. Thus, this factor weights slightly in favor of Ohio law.

The subject-matter is located in California. The fuel systems are put inside trucks which, aside from one test-truck, drive exclusively in California. Repairs, while organized in Ohio, are done in California. This factor weighs in favor of California law.

Considering the final factor, the location of the parties, Worthington is incorporated in Ohio and has its principal place of business in Ohio. (*Id.* ¶¶ 1–2.) In contrast. Inland is incorporated in New Mexico and has its principal place of business in Burnaby, British Columbia. (*Id.* ¶ Peterman Decl. ¶ 2.) Only Worthington has an office in Ohio, while both parties have offices in California. (*Id.* ¶¶ 1–2; Peterman Decl. ¶ 19.) This factor leans slightly toward California law.

In sum, the first and second factors are inconclusive but weigh slightly in favor of California law, the third factor leans slightly in favor of Ohio law, and the fourth and fifth factors weighs in favor of California law. The Court finds that for purposes of weighing the public factors as to whether the case should be transferred, California law applies and thus, the choice of law factor favors transfer.[8] *See Jamhour*, 211 F. Supp. 2d at 951.

---

[8] The Court notes that even if after discovery Worthington can show Inland did become bound by the Terms and Conditions and thus, Ohio law applies or there is some other evidence of applicable law being Ohio, this factor would then simply become neutral. The issue involved, breach of contract through a cancellation notice, is not alleged to present any novel or complex issue under state law. Courts are certainly capable of applying another state's law on this issue. *See Grubb v. Day to Day Logistics, Inc.*, No. 2:14-cv-01587, 2015 U.S. Dist. LEXIS 86543, at *58–59 (S.D. Ohio July 2, 2015) (finding the choice of law factor neutral because while keeping the case in Ohio may have required the Ohio court to apply Virginia tort law, neither party "contend[ed] applicable Virginia law [was] unique or difficult"); *Phelps v. United States*, No. 1:07CV02738, 2008 U.S. Dist. LEXIS 108000, at *12 (S.D. Ohio Feb. 19, 2008) (noting that while keeping the case in Ohio would require Ohio to apply Michigan law, "to the extent that the case will require interpretation of Michigan law, that law is not likely to be exceedingly complicated" for this Court is familiar with the principles of negligence law" and thus, the value of the choice of law factor was weakened).

### c.  States' Interest in This Matter

Inland argues that California has an interest in deciding this matter because it concerns a dispute that arose within its borders. (Def.'s Mot. Dismiss at 24.) Inland points to the negotiations that took place in Southern California and the communications sent to and from California. (*Id.*) Additionally, Inland notes Worthington has been sued in California in the past and is currently being sued there now. (*Id.*; ECF Nos. 9-1, 9-2, 9-3.)  Additionally, the issues in this case are similar to the issues in at least some of the cases being litigated in California. (*See* Khudikyan Decl. ¶ 22.)

Worthington, in contrast, argues Ohio has an interest in resolving a dispute brought by one of its residents who has been injured inside Ohio. (Pls.' Resp. at 28 (citing *Scotts Co. v. Aventis SA*, 145 F. App'x 109, 115 (6th Cir. 2005) (finding the third due process requirement for personal jurisdiction satisfied because "Ohio has an interest in resolving a suit brought by one of its residence against Defendants that purposefully availed themselves of acting in and causing consequences in Ohio").)

The Court finds both Ohio and California have interests to this cause of action, but California has a stronger interest because the claims have a greater connection to California. Ohio has an interest in protecting its resident, Worthington.  California has an interest in resolving disputes which arose a great part in California.  The parties had at least eight meetings in California. (*See* Peterman Decl. ¶¶ 7–13.) Additionally, the subject-matter ends up in California, and is used solely in California. (Compl. ¶ 29.) Thus, the subject-matter, the CNG fuel systems, could affect California and its residents.  Worthington also may have manufactured the subject-matter of the contract in California. (*See* Peterman Decl. ¶ 12.)  Further, Worthington sold a product, knowing it would be used by a California company, AJR. (Compl. ¶ 15; Takavitz Decl.

¶ 21.) Thus, California's resident is affected. In sum, California has a greater interest. The states' interests factor weighs in favor of transfer.

### iii. Balancing the Private and Public Interests

The Court found that two of the private interests weigh in favor of transfer and one of the private interests is neutral. Additionally, all three of the public factors weigh in favor of transfer. Thus, in considering these interests, combined with the fact that the case could have been brought in the Central District of California, the Court finds transfer is appropriate under § 1404.[9] *P&G Co.*, 2012 U.S. Dist. LEXIS 167208 at *6.

Importantly, transfer will not simply shift inconvenience from one party to another, but instead will make trying the case more convenient. Worthington has an office in California and its representatives relevant to this case spend considerable time in California as shown by the numerous meetings the representatives had in California. Thus, transfer in this case is not to a forum equally as convenient or inconvenient, but on a whole, more convenient for the parties. *See Shanehchian v. Macy's, Inc.*, 251 F.R.D. 287, 292 (S.D. Ohio 2008) ("28 U.S.C. § 1404 does not allow for transfer to a forum that is equally convenient or inconvenient, nor does it allow for transfer if that transfer would only shift the inconvenience from one party to another.").

### IV.

For the reasons set forth above, the Court **GRANTS** Defendant's Request for Judicial Notice (ECF No. 9). Additionally, the Court **GRANTS in part and DENIES in part** Defendant's Motion to Dismiss for Improper Venue or, in the Alternative, to Transfer Venue (ECF No. 8). This case is hereby **TRANSFERRED** to the United States District Court for the Central District of California.

---

[9] Inland also moves to transfer under §1406, which the Court need not address because transfer is appropriate under § 1404.

39

**IT IS SO ORDERED.**

3-18-2020

_____
**DATE**

_____
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**